OPINION *Page 2 
{¶ 1} On August 24, 2006, Magnolia Police Officer Nicholas Kline received a complaint about possible neglect involving dogs located in a barn in Waynesburg, Ohio. Officer Kline went to the barn to investigate, and entered the barn through an unlocked door. Based upon his observations on the condition of the dogs, Officer Kline called the Humane Society. On same date, Humane Society Officer Ron Sheaks went to the barn and posted a notice for someone to contact the Humane Society within twenty-four hours. The next morning, Officer Neil Denzer from the Stark County Dog Warden's Department went to the barn. He was joined by Officer Sheaks. Based upon their observations, they contacted the Magnolia Police Department for assistance. Sergeant Barbara Gardener arrived, as did the Assistant Director of the Humane Society, Jackie Godbey. The officers entered the barn through the unlocked door and removed the dogs, forty-two in all.
 {¶ 2} Thereafter, appellant, Candy Martin, was charged with two counts of cruelty to animals in violation of R.C. 959.13. Two others were also charged, Joan Fisher and Belinda Rife Anello. On September 20, 2006, appellant filed a motion to suppress, claiming an illegal search and seizure. A hearing was held on October 30, 2006. By judgment entry filed November 9, 2006, the trial court denied the motion.
 {¶ 3} A jury trial was held on November 13, 2006. The jury found appellant guilty as charged. By judgment entry filed November 16, 2006, the trial court sentenced appellant to an aggregate term of ninety days in jail, seventy days suspended.
 {¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows: *Page 3 
 I {¶ 5} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING HER MOTION TO SUPPRESS, AS THE EVIDENCE AGAINST HER WAS OBTAINED IN VIOLATION OF HER RIGHTS AS AFFORDED BY THE FOURTH, FIFTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 14
AND 10 OF THE CONSTITUTION OF THE STATE OF OHIO."
 II {¶ 6} "THE APPELLANT WAS DEPRIVED OF HER RIGHT TO A FAIR TRIAL WHEN THE PROSECUTOR FAILED TO COMPLY WITH CRIMINAL RULE 16."
 III {¶ 7} "THERE WAS NOT SUFFICIENT EVIDENCE TO FIND THE APPELLANT GUILTY OF CRUELTY TO ANIMALS, AND HER CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 IV {¶ 8} "THE APPELLANT WAS DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 I {¶ 9} Appellant claims the trial court erred in denying her motion to suppress evidence gathered during the search of the leased premises, the freestanding barn, without a warrant. We disagree.
 {¶ 10} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. *Page 4 
In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19; State v.Klein (1991), 73 Ohio App.3d 485; State v. Guysinger (1993),86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. State v. Williams (1993), 86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case.State v. Curry (1994), 95 Ohio App.3d 93; State v. Claytor (1993),85 Ohio App.3d 623; Guysinger. As the United States Supreme Court held inOrnelas v. U.S. (1996), 116 S.Ct. 1657, 1663, ". . . as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."
 {¶ 11} In its November 9, 2006 judgment entry, the trial court found the following facts that are supported by the evidence and essentially not contested by appellant:
 {¶ 12} 1. The Stark County Humane Society had received approximately five telephone calls concerning numerous barking dogs and an overwhelming smell coming from the barn. October 30, 2006 T. at 7-8.
 {¶ 13} 2. On August 24, 2006, Humane Society Officer Sheaks visited the barn. Two houses were nearby. Id. at 10. One large house was vacant and the other smaller *Page 5 
house was a rental. Id. The barn was approximately five hundred feet from the larger house. Id. at 39. Officer Sheaks was unable to discern who rented the barn. Id. at 11-12.
 {¶ 14} 3. As a result of his investigation, Officer Sheaks posted a pink notice next to the padlock on the white barn. Id. at 12. The notice asked someone to contact the Humane Society within twenty-four hours. Id.
 {¶ 15} 4. On August 25, 2006 at approximately 10:30 a.m., Dog Warden Officer Denzer arrived at the barn. Id. at 38. Officer Sheaks arrived shortly thereafter. Id. at 41. They were joined by Magnolia Police Sergeant Gardener and Humane Society Assistant Director Godbey. Id. The notice was still in the same place. Id. at 13.
 {¶ 16} 5. Ms. Godbey testified as she exited her vehicle, there was an overwhelming odor of ammonia from urine. Id. at 14. She heard many barking dogs. Id. The temperature was around eighty degrees, and the humidity level was around eighty to eighty-one percent. Id. at 16. Through side windows, a large number of caged dogs were discovered. Id. at 40.
 {¶ 17} 6. As a result of the officers' observations, Ms. Godbey and the officers entered the barn through an unlocked sliding door. Id. at 17, 42.
 {¶ 18} The trial court premised its decision on the finding that there was a limited expectation of privacy in an unlocked barn five hundred feet from the home, and the decision to enter the barn was reasonable given the conditions, thereby giving rise to exigent circumstances. The trial court further found under the plain view/plain smell exception to a warrant that the search was reasonable. *Page 6 
 {¶ 19} Appellant challenges the trial court's conclusions on curtilage, plain view/plain smell and exigent circumstances.
 {¶ 20} The first inquiry is whether the barn was within the curtilage of the home. In State v. York (1997), 122 Ohio App.3d 226, 231, our brethren from the Eleventh District discussed the concept of curtilage as follows:
 {¶ 21} "It has long been held that a person's house is his or her castle and that law enforcement officials may not enter a person's residence to search for evidence of a crime without a search warrant.Weeks v. United States (1914), 232 U.S. 383, 389-390, 34 S.Ct. 341, 343,58 L.Ed. 652, 654-655. Fourth Amendment protections of the home generally extend to the outbuildings located upon the curtilage, such as barns, and it can be fairly said that property owners have legitimate expectations of privacy in them. Oliver v. United States (1984),466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225."
 {¶ 22} The specific facts in the case sub judice establish the owner of the home was not the lessee of the barn. Therefore, the curtilage rule is inapplicable. It was not established in the record which of the three co-defendants had leased the barn, but it was established the property owner had moved out of state. October 30, 2006 T. at 9-10. The renter of the smaller house on the property did not have any ownership interest in the property or the barn. Id. at 11. We further conclude the expectation of privacy that arises under the curtilage doctrine does not apply in this case even under the following four factors set forth by Justice White in U.S. v. Dunn (1987), 480 U.S. 294, 301: *Page 7 
 {¶ 23} "Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."
 {¶ 24} The barn sub judice was five hundred feet from the home, the barn was not within an enclosure surrounding either the larger or the smaller home, the barn was used to house some forty dogs, and although padlocked in front, the barn was visible from the road and was unlocked via the sliding door.
 {¶ 25} Even if other tribunals may find the barn, because it was leased by separate parties, had some expectation of privacy, we further find that under the plain view/plain smell exception and exigent circumstances doctrine, the search was reasonable.
 {¶ 26} The York court addressed a fact scenario strikingly similar to the facts in this case. In York, a Humane Society officer looked into a barn after receiving complaints about a dead horse and after hearing moaning sounds from the barn. The officer observed an emaciated, dehydrated and starving pony. The court concluded looking into the barn was not surveillance, and any subsequent search was justified under the "open view" doctrine.
 {¶ 27} In this case, the officers heard the barking of numerous dogs which was the genesis of the complaints. Standing alone, barking is not cause for a search *Page 8 
because "all dogs bark." However, the ammonia smell caused by excessive urine was readily apparent upon approaching the barn. The smell was described as "overwhelming." October 30, 2006 T. at 14. Dog Warden Officer Denzer observed through a window seventeen animals confined in cages or carriers stacked three high. Id. at 40. The temperature outside was eighty degrees with high humidity. Id. at 16, 41. It was with these readily open and observable facts that the officers entered the barn.
 {¶ 28} We conclude all of these collective factors led to a justified search under either the open view exception or the exigent circumstances doctrine. Further, the evidence in this case would clearly have been discovered if a warrant had been obtained; therefore, the inevitable discovery rule is applicable:
 {¶ 29} "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means * * * then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." Nix v. Williams (1984),467 U.S. 431, 444.
 {¶ 30} The facts alone would have justified the issuance of a search warrant: there were numerous complaints of barking dogs that were verified on two separate days, a twenty-four hour notice was posted with no response, there was a noxious odor coming from the barn, and there was verification of numerous dogs stacked in cages.
 {¶ 31} Upon review, we find the trial court did not err in denying appellant's motion to suppress.
 {¶ 32} Assignment of Error I is denied. *Page 9 
 II {¶ 33} Appellant claims the trial court erred in permitting the state to present witnesses that were disclosed twenty days after the deadline for discovery in violation of Crim.R. 16. We disagree.
 {¶ 34} Crim.R. 16 governs discovery and inspection. Subsections (D) and (E)(3) state the following, respectively:
 {¶ 35} "If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection.
 {¶ 36} "(3) Failure to comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."
 {¶ 37} As Crim.R. 16(E)(3) states, the admission or exclusion of the evidence lies in the trial court's sound discretion. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and *Page 10 
not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217.
 {¶ 38} Appellant argues she had the right to have the complained of witnesses, Ronald DeRhodes, D.V.M. and April McKenzie, excluded because they were disclosed seven days prior to trial or in the alternative, she should have been granted a continuance of the trial.
 {¶ 39} We note the trial court afforded defense counsel the opportunity to talk to Ms. McKenzie prior to trial. T. at 11. In the state's initial response to discovery filed October 10, 2006, the veterinary report signed by both witnesses was referenced and made available.
 {¶ 40} We note appellant had an expert testify at trial, Bradley Neer, D.V.M. Dr. Neer testified as to the cause of death of the dogs and the condition of the dogs in contradiction to the state's witnesses. T. at 347, 353-354, 357.
 {¶ 41} Given the opportunity afforded by the trial court, the disclosure of the signed veterinary report, and the testimony of Dr. Neer contrary to the observations and testimony of the state's witnesses, we find no abuse of discretion by the trial court.
 {¶ 42} Upon review, we find the trial court did not err in permitting the testimony of the complained of witnesses.
 {¶ 43} Assignment of Error II is denied.
 III {¶ 44} Appellant claims her convictions are against the manifest weight of the evidence. We disagree. *Page 11 
 {¶ 45} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175. See also, State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
 {¶ 46} Appellant was convicted of cruelty to animals in violation of R.C. 959.13(A)(1) which states, "No person shall: * * * Torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water."
 {¶ 47} The requisite mental state for this offense is recklessness.State v. Bergen (1997), 121 Ohio App.3d 459. Appellant argues there was no evidence as to which dogs belonged to her therefore, the record does not support that she personally recklessly did any of the acts in R.C.959.13(A)(1). Appellant points out at least eight dogs did not have a life threatening condition or exhibit torture.
 {¶ 48} Appellant argues it was not until she testified that it was established she even owned some of the dogs. A Crim.R. 29 motion for acquittal was made at the close of the state's case-in-chief. T. at 295. The motion was not made with any specificity regarding the arguments included in this assignment of error, nor has the denial of the motion been assigned as error. *Page 12 
 {¶ 49} We must extend our inquiry to the entire record, including appellant's testimony. Appellant's husband, Steve Martin, admitted to moving four of their dogs to the barn for about four days. T. at 297. He stated he cleaned, repaired and readied the barn for the animals the first week of August 2006. T. at 298-299. Mr. Martin also stated he cleaned the cages and the room on August 22, 2006, three days prior to the dogs' removal. T. at 301. Appellant accompanied her husband to the barn on said date. T. at 302. Mr. Martin returned on August 24, 2006, but only fed and watered their four dogs, and placed "water in the bowls that were empty" of the other dogs. T. at 302, 319.
 {¶ 50} Appellant identified dogs 16, 17, and 18 as hers, but could not determine which dog was "Cheyenne." T. at 406-407. The last time appellant was at the barn prior to removal was on August 23, 2006. T. at 408. She spent about eight or nine hours fixing up the barn and greeting, socializing, watering, and feeding the dogs. T. at 408-411. Appellant admitted being concerned about the condition of the barn prior to her dogs moving in. T. at 413. She took part in providing ventilation, clean-up and repair. T. at 418-421. The remainder of appellant's testimony consisted of denying and contradicting the findings of the state's witnesses.
 {¶ 51} Balanced against appellant's testimony was the testimony of the state's witnesses. The mother of a neighbor adjacent to the subject property, JoAnn Withers, and Officer Kline both testified the barking dogs and strong odor were discernable to a car passing by. T. at 66, 80. Officer Kline testified to the "rank" smell of the barn and the lack of ventilation, no fans or open windows. T. at 82. Officer Kline was in the barn on August 24, 2006 and at that time, he observed dogs that were listless and unfed with *Page 13 
water dishes filled with feces or urine or a mixture of both. T. at 83. Sergeant Gardner testified on August 25, 2006, she observed dogs that appeared skinny, malnourished and dehydrated, unclean cages that "haven't been cleaned in a while," and dishes with no water, food, and filled with feces and/or urine. T. at 93-94. Dog Warden Officer Denzer testified to the "pungent odor" and the heat and high humidity on August 25, 2006, and also observed stacked cages or crates up to three high, containing seventeen dogs. T. at 109-110, 112. The cages/crates were dirty, and there was no water or food in the cages. T. at 113-114.
 {¶ 52} Ms. Godbey testified the temperature on August 25, 2006 was in the low eighties with high humidity. T. at 147. There was no visible evidence that any dog had been exercised outside the barn. T. at 147-148. There was a "grossly" degree of ammonia smell outside the barn from the "large quantities" of urine. T. at 149. Ms. Godbey described the floors of the barn as "sticky and slippery from urine and feces all over," with no open windows or doors. T. at 150. There were approximately three fans, but they were covered with "hair and filth * * * no way possible that they could circulate proper air for anything." T. at 151. Some of the "pet taxis" or cages were too small for the dogs they housed, and were filthy with "mold on the walls." T. at 151-152. The heat and humidity inside the barn were "exhausting," and coupled with the smell, it was hard to breath. T. at 152-153. Each section of the barn was in like condition. T. at 153-154. There was no running water in the barn, and there was no food or water in the cages. T. at 154-155. Ms. Godbey specifically testified there was no food or water in appellant's section of the barn. T. at 155. She summed up the conditions in the barn as follows: *Page 14 
 {¶ 53} "They [the dogs] were unsocialized. They were scared. Some of them were covered in their own waste. They were as afraid of us as we were afraid of them. Normally when you go up to a dog, you kind of get close to `em. You couldn't do that. They were scared. They were barking. They were standing in their own waste. The poop was stuck in some of their furs. There were fleas. Their nails were overgrown. We did do a dehydration test on some a couple and that's where you'll take the back of the neck and lift the fur and if the fur goes right back down, that's a sign of non-dehydration. If the fur remains up, it shows dehydration. And the ones that we could get close enough to and attempt to do this with, the fur did remain up, showing us that they were dehydrated." T. at 156.
 {¶ 54} Ms. Godbey observed several of the dogs had "scars on their front legs, over their eyes. The one dog has facial irritation. Many of them had ear infections. They were covered in fleas. Tapeworms. Roundworms." T. at 160. Dr. DeRhodes and Dr. Charles Heller testified as to the conditions of the dogs. Dr. DeRhodes examined two dogs on August 25, 2006 that were so severely compromised they were near death. T. at 218. The dogs "were panting severely and — and blood was coming from the mouth and the rectum, and they were just non-responsive." Id. Dr. DeRhodes ordered to "put down" the dogs. Id. The next day, he numbered and examined the remaining dogs. T. at 219. The results were compiled in Plaintiff's Exhibit 4. Id. Dr. Heller examined two other dogs that had died and determined they had Parvo. T. at 210-214.
 {¶ 55} We find sufficient evidence beyond a reasonable doubt to support appellant's conviction. The facts do not paint a mere "guilty by association" verdict. Appellant admitted to helping and facilitating the conditions at the barn, although all of *Page 15 
her assertions cast her only in a good light. Appellant participated in repairing, ventilating, and cleaning the barn no more than two days before the search. It is unexplainable that conditions could have deteriorated in such a short period of time. Further, there was specific testimony as to her area of the barn and the conditions of the cages and the dogs tended by her.
 {¶ 56} Upon review, we find no manifest miscarriage of justice.
 {¶ 57} Assignment of Error III is denied.
 IV {¶ 58} Appellant claims she was denied the effective assistance of trial counsel. We disagree.
 {¶ 59} The standard this issue must be measured against is set out inState v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990), 497 U.S. 1011. Appellant must establish the following:
 {¶ 60} "2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; Strickland v.Washington [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)
 {¶ 61} "3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Page 16 
 {¶ 62} This court must accord deference to defense counsel's strategic choices made during trial and "requires us to eliminate the distorting effect of hindsight." State v. Post (1987), 32 Ohio St.3d 380, 388.
 {¶ 63} Appellant argues by simultaneously representing all three defendants, defense counsel could not present her case effectively in light of the conditions of the dogs of the other two co-defendants. We note appellant chose her trial counsel, and chose to participate in the united defense that they did nothing wrong and any deaths were caused by the actions of the Humane Society. She maintained this united front throughout her own testimony. Appellant defended the cleanliness charge, the malnutrition claim, and the claims of lack of food, water, and ventilation. By presenting this united front, appellant chose her own defense, and it was re-affirmed by her husband's testimony.
 {¶ 64} Upon review, we conclude appellant has failed to establish any deficiency on the part of defense counsel.
 {¶ 65} Assignment of Error IV is denied. *Page 17 
 {¶ 66} The judgment of the Canton Municipal Court of Stark County, Ohio is hereby affirmed.
 By Farmer, J., Gwin, P.J., and Wise, J., concur. *Page 18 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Canton Municipal Court of Stark County, Ohio is affirmed. *Page 1